## Commonwealth v. Lauer

*Samuel G. Teeter, Assistant District Attorney,* for Commonwealth.
*Samuel D. Gates,* for defendant.

SPICER, *P.J.*, February 6, 1981—Defendant was arrested January 19, 1980 and charged with the crime of attempted robbery. At the time of his arrest, he was in his pickup truck which was parked behind a bank and along Water Street in the Borough of Abbottstown.

Abbottstown is a small borough (we will call it a town) in Adams County, Pa. Two main traffic routes proceed through the town. U.S. Route 30 runs east and west and Pennsylvania Highway Route 194 proceeds north and south. The center of town is where these trafficways intersect. The center is circular shaped but is called the town's square.

The Farmers Bank and Trust Company is the only bank in town and is in the northeastern quadrant of the square. It is bounded on the west by Route 194 and in the back by the alley called Water Street. Across Route 194 and in the northwestern quadrant of the square is a business establishment called Handy Market. It also backs on Water Street. Water Street runs east and west.

January 19, 1980 was a warm, sunny, and pleasant day. There were no hunting seasons in effect.

During the afternoon, Ronald Dehoff saw a man on Water Street dressed in raingear which has been described as a slicker, a raincoat, and a poncho. The man was standing near a green pickup and when Mr. Dehoff saw him, moved his head "like he wanted to hide something." Mr. Dehoff observed a gun barrel protruding from the base of the raingear.

Although Mr. Dehoff could not identify the man, it is apparent he was defendant.

Mr. Dehoff went into the Handy Market and told the manager, Earl Strausbaugh, that he had seen a man with a gun and that Mr. Strausbaugh should "watch himself."

Mr. Strausbaugh then went outside and saw defendant standing watching the bank. At this time, defendant was wearing a ski mask and when he saw Mr. Strausbaugh looking at him "he sort of leaned over to his right sort of to hide his face."

Meanwhile, Mr. Dehoff had proceeded to the Abbottstown Fire Company. He related what he had just seen and as a result accompanied a third person to the office of John Howe. The office was described as being on the other side of Abbottstown, presumably in the western part of town. The man with Mr. Dehoff reported to Mr. Howe "there was a Ford pickup, license plate bent down, and a man with a raincoat, rifle, possible robbery in process."

Mr. Howe in turn reported this to Adams County Control and then himself proceeded toward the town square to verify to the extent possible, what he had reported. He saw a pickup truck travelling west on Water Street and he then went around the block to check on the truck. He then saw the truck proceeding east on Water Street. Later he saw the

truck parked in a parking lot and saw the operator sitting in the truck wearing a ski mask. The license plate was bent up so that it could not be read. There was testimony to indicate the bending was of such a nature to make it unlikely it had been accomplished accidentally.

Adams County Control contacted two police officers by radio. One was Ralph Zinn, Abbottstown Police Chief. When Chief Zinn received the call, he was outside town, unarmed, and out of uniform. He nonetheless proceeded into town.

The substance of the call to Chief Zinn was that there was a possible robbery at the bank. The person involved was described as a male, possibly armed with a rifle, in a dark or green pickup truck. The truck was described further as having a bent-up license plate and was said to have been parked behind the bank.

When Chief Zinn arrived in town he saw a green and white pickup truck pull out from a street east of the square and proceed west on Route 30. When the driver passed the bank, he looked at it.

The other officer contacted was Edward Powers, Jr., Oxford Township Chief. He was told there was "an armed robbery going down at the bank in Abbottstown." The person involved was described as having a bent-up license plate on his vehicle.

While en route to Abbottstown, Chief Powers saw a pickup truck. He contacted Chief Zinn by radio and was told the suspected truck was still in Abbottstown. Chief Powers then proceeded to Abbottstown and was shown by Chief Zinn where the truck was parked. Chief Powers then went to Water Street and saw the truck. Defendant was inside and was "peeking out the window back at" Chief Powers.

Chief Powers then arrested defendant and made him exit the vehicle. While Powers was searching defendant, Chief Zinn looked into the truck's interior and saw a rifle which was partially covered by raingear. Chief Zinn then removed the rifle and found it to be loaded.

Chief Powers elicited some statements about the gun before giving defendant his Miranda warnings. After defendant was handcuffed and placed in the police cruiser, the officers removed other articles within plain view from the truck's interior. They did not search the glove compartment. The articles seized, in addition to the rifle, were a box of .44 magnum cartridges, a ski mask, a toy pistol and a poncho or slicker. Defendant had a folded paper bag in his hip pocket. Mr. Strausbaugh identified the ski mask as the one worn by the man he had seen behind his market.

Defendant filed timely pretrial applications to suppress evidence and to quash the information. A hearing was held April 16, 1980 on the suppression motion and the court handed down findings of fact and denied the motion. The motion to quash was never addressed by the court and the case was scheduled for trial by the Commonwealth without an order being entered on this motion.

The case was tried before a jury May 15, 1980. Defendant took the stand and denied any intent to commit robbery. He said he had been drinking beer during the day of the alleged offense and wanted to sleep. He explained his many truck movements by saying that he wanted to find a place where he would not be disturbed and where he would not be parking on private property. He said he had taken the gun earlier that day to shoot ground hogs at his sister's home near Hanover. While conceding the

day was sunny, he said it was too cold to be comfortable sleeping without the motor running and without wearing the ski mask. He had no explanation for the rifle being loaded or for the fact he had a folded up paper bag in his pocket.

His testimony disputed the Commonwealth's contention that the day was warm, with temperatures possibly as high as 60. In order to corroborate his testimony and to contradict the Commonwealth witnesses, defendant intended to show the temperature as reported in The Gettysburg Times. That paper publishes the high and low temperatures for the previous day. Since January 19, 1980 fell on a Saturday, defense counsel had two newspapers, one for Saturday showing the temperature on Friday and another for Monday, showing the temperature on Sunday.

Monday's paper contained an article describing the incident with which the trial was concerned. A large picture of defendant, his hands obscured by a car, appeared on the fifth page. The picture obviously depicted defendant being in custody and under the picture was a brief description of the incident preceded by "Texan Arraigned."

Defendant testified he was planning to move to Texas but that he lived in Pennsylvania.

The trial occurred in Courtroom Number One. The jury was not sequestered during trial. During recesses, they remained in the deliberation room immediately adjacent to the courtroom. This room has two doors, one opening into the courtroom and the other opening into the controlled access area of the fourth floor. In the area in the immediate vicinity of the second door are the work areas for the court reporters and the court administrator's office. During the course of trial, various people, including

defendant, made telephone calls on telephones in this area.

When defense counsel sought to introduce the newspapers, he could not find them. He left the courtroom to search for them and in his absence a juror volunteered the following:

Your Honor, I think it's in our room. Nobody looked at it though. I picked it up by mistake when I made a phone call, and I saw his picture and I threw it in the garbage can.

The jury had been instructed not to read anything in the newspapers concerning the case.

Defense counsel then returned to the courtroom and the court informed him of the juror's comment. The juror volunteering the information was the only juror who saw the newspaper. He said he did not read it. He told the court that his ability to judge the case fairly and impartially would not be affected by his having seen the picture.

The court then said it would consider the picture to determine whether its effect would be prejudicial. Although no finding appears on the record, the court did not consider the picture to be inflammatory or prejudicial so as to require further action.

Defendant testified that he earned substantial income and had no desire or need to rob a bank or anything else. An assistant district attorney questioned defendant's financial status on cross-examination and elicited the fact that defendant owed money to a person for whom defendant had driven a truck. The following occurred:

Q. Didn't you owe him that money as a result of a problem with something you were hauling for him?

A. Yes.

Q. Isn't that how you came to owe him that money?

A. It was on a claim we had on some freight. We lost a load and I wound up paying half of it.

Defense counsel then moved for a mistrial. The court, noting the delayed objection, overruled it. The court observed that the reason for the debt was immaterial but that defense counsel could not sit back and take his chances on an answer before objecting to it. The court further found nothing prejudicial about the answer.

After the jury found defendant guilty the court set the gradation of the offense as a felony of the second degree. Post-verdict motions have been argued and are now ripe for disposition. The court will address the reasons in the order raised.

## 1. THE MOTION TO QUASH THE INDICTMENT

The court feels a little remiss in overlooking this motion prior to trial. The court should have ruled on it at the same time it ruled upon the motion for suppression. However, neither defendant nor the Commonwealth brought this fact to the court's attention.

It may have been important to rule prior to trial because the Commonwealth has never sought to amend its information.

The basis for the motion is that the Commonwealth did not describe the elements of robbery nor did it specify which particular provision of the Crimes Code, 18 Pa.C.S.A. §3701, defendant intended to breach. The information set forth with some detail the elements of attempt and the acts which defendant committed and said merely that the attempt was "to commit the specific crime of robbery."

Pa.R.Crim.P. 225 requires that an information contain "(5) a plain and concise statement of the

essential elements of the offense substantially the same as or cognate to the offense alleged in the complaint."

Both the complaint and the information set forth a summary of the acts defendant was charged with doing. Both referred to the bank, the truck, the ski mask, the rifle, and the bent-up license plate. The allegations would have justified a prosecution under 18 Pa.C.S.A. §3701(a)(1)(ii) or (iv). In fact, the court charged on the requirements of those three subsections. Conviction of an attempt to commit any would have constituted a felony of the second degree.

It has been said that the purpose of an indictment or information is to provide a defendant with sufficient notice to prepare a defense and to insure that he will not be tried twice for the same act: Com. v. Rolinski, 267 Pa. Superior Ct. 199, 406 A. 2d 763 (1979). The elements of the offense with which defendant is charged must be set forth in the body of the information. A statutory citation is not sufficient: Com. v. Walters, 250 Pa. Superior Ct. 392, 378 A. 2d 993 (1977).

It is unclear whether an information charging an attempt must set forth the elements of the intended crime. Assuming that it is, the failure by the Commonwealth to do so can be remedied by amending the information so long as the amendment does not charge a more serious crime: Com. v. Fierst, 257 Pa. Superior Ct. 440, 390 A. 2d 1318 (1978); Com. v. Herstine, 264 Pa. Superior Ct. 414, 399 A. 2d 1118 (1979).

The court holds that the information in this case was subject to amendment. Had the motion to quash been brought to the court's attention prior to trial, an opportunity to amend would definitely have been given the Commonwealth.

We will, therefore, deny the motion to quash.

## 2. MOTION TO SUPPRESS

Defendant contends his arrest was without probable cause and therefore illegal. If this be so, all evidence obtained, having resulted from the arrest, was illegally obtained.

The determination of probable cause depends upon the particular facts of the case. In this case, the court holds that Chief Zinn and Chief Powers were given information via radio which was corroborated. The officers acted contemporaneously. The suppression motion was properly denied: Com. v. Vessels, 274 Pa. Superior Ct. 100, 416 A. 2d 1108 (1979).

## 3. THE DEMURRER

Obviously, an issue of fact was presented to the jury. Looking at the facts from a light most favorable to the Commonwealth and drawing reasonable inferences therefrom, it would appear defendant intended to rob the bank. He was armed, acted furtively, inspected the bank many times, wore a mask, and carried a container in which to carry away the money. The demurrer was properly overruled.

## 4. MOTION FOR A MISTRIAL

Subject to certain exceptions not involved in this case, the rule is clear the Commonwealth cannot waft hints to the jury that defendant has engaged in criminal activity unrelated to the charge. See Com. v. Strohl, 226 Pa. Superior Ct. 225, 307 A. 2d 300 (1973); Com. v. Bond, 261 Pa. Superior Ct. 311, 396 A. 2d 414 (1978).

Defendant argued that forcing him to answer he had lost a load violated this rule. He contends that the connotation of the phrase is that cargo was stolen and that he was involved.

We observe that the choice of words was defendant's. He certainly could have answered the question with a simple "yes."

More importantly, the court disagrees that the answer carries such a connotation. The cargo could have been damaged, misplaced, or destroyed. The motion is overruled with respect to this contention.

It was unfortunate that defendant's newspaper found its way into the jury room. However, the court fully explored the effect or lack of it at time of trial.

The picture of defendant certainly suggests he was in custody, a brief description under the picture described him as being handcuffed. The picture does not show him handcuffed, and Juror Number 14 stated he had not read the paper. Without reading the article, it was fairly obvious from the date of the paper that the picture related to this case.

The court concluded the picture had no effect on the jury's deliberations.

The motion with respect to this contention is overruled and the attached order will be entered.

## ORDER

And now, February 6, 1981, defendant's post-verdict motions are overruled. The probation office is directed to perform a presentence investigation and to submit a report to this court prior to sentencing. Defendant is directed to report for sentencing April 27, 1981, at 9:00 a.m.